**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DAWN M. EVANS, | : | CIVIL NO.: 1:21-cv-00554 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| v. | : | |
| | : | |
| | : | |
| KILOLO KIJAKAZI,[1] | : | |
| Acting Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant. | : | |

## <u>MEMORANDUM OPINION</u>

## I. Introduction.

In this social security action, Plaintiff Dawn M. Evans seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits under Title II of the Social Security Act.  We have jurisdiction under 42 U.S.C. § 405(g).  For the reasons set

---

[1] Kilolo Kijakazi is now the Acting Commissioner of Social Security, and she is automatically substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d) (providing that when a public officer sued in his or her official capacity ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party"); 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

forth below, we will vacate the Commissioner's decision and remand the case to the Commissioner for further proceedings.

## II.  Background and Procedural History.

We refer to the transcript provided by the Commissioner. *See docs. 14-1 to 14-7.*[2]  On February 19, 2016, Evans protectively filed[3] an application for disability insurance benefits, alleging that she has been disabled since April 1, 2013. *Admin. Tr.* at 287–88.  After a hearing, and by a decision dated March 9, 2018, Administrative Law Judge Michele Stolls denied Evan's claim. *Id.* at 201–21.

Evans appealed that decision to the Appeals Council, which vacated the decision of Administrative Law Judge Stolls and remanded the case to a different administrative law judge. *Id*. at 222–27.  The Appeals Council remanded the case "for resolution of the following issues":

---

[2] Because the facts of this case are well known to the parties, we do not repeat them here in detail.  Instead, we recite only those facts that bear on Evans's claims.

[3] "Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits." *Stitzel v. Berryhill*, No. 3:16-CV-0391, 2017 WL 5559918, at *1 n.3 (M.D. Pa. Nov. 9, 2017).  "A protective filing date allows an individual to have an earlier application date than the date the application is actually signed." *Id.*  Here, Evans's application for benefits is dated February 22, 2016. *See Admin. Tr.* at 287.  But there are references in the record to the filing date as February 19, 2016. *See id*. at 189, 200.  And February 19, 2016, is the date identified by Administrative Law Judge Stolls as the date that Evans protectively filed her application. *Id*. at 204.

- The Administrative Law Judge adjudicated from the claimant's alleged onset date of April 1, 2013 through the date last insured of December 31, 2016, but did not address the issue of reopening.  The claimant filed a prior application for a Period of Disability and Disability Insurance Benefits on August 27, 2015, alleging an onset date of September 24, 2013.  An initial determination was made on November 13, 2015, which became final and binding per 20 CFR 404.987.  A prior final determination may be reopened only under limited circumstances defined by regulation (20 CFR 404.988).  Here, the Administrative Law Judge invades a period previously determined without adequately considering whether re-opening is appropriate.  Further clarification of the applicable period at issue is necessary.  If any of the period previously determined or decided for the claimant's prior applications is considered here, additional clarification of what the regulatory basis is for re-opening will also be required.

- In assessing the claimant's mental residual functional capacity, the Administrative Law Judge found the claimant can have "relatively few work place changes" (Finding 4).  The phrase "relatively few work place changes" does not represent a clear function-by-function assessment of the claimant's remaining ability to do work-related mental activities as required by Social Security Ruling 96-8p.  Furthermore, the Administrative Law Judge found the claimant has mild limitation in adapting or managing oneself in the workplace, which indicates the claimant is not as limited in her ability to adapt to changes as found by the Administrative Law Judge.  Therefore, further evaluation of the claimant's residual functional capacity is necessary.

- The hearing decision indicates, "The record, including the treatment of her mental health impairments and her activities of daily living as reported in her function report, supports moderate limitations" in understanding, remembering, or applying information.  It is unclear from the rationale provide why the treatment of her mental impairment and

which activities of daily living supports this finding.
Therefore, further consideration is needed.

- At step 5 of the sequential evaluation process, the
  Administrative Law Judge found the claimant could perform
  the work of laundry worker/folder and cited to *Dictionary of
  Occupational Titles* code 396.687-018.  This *Dictionary of
  Occupational Titles*, however, code does not exist.  Further
  evaluation is necessary.

*Id*. at 224–25.  And the Appeals Council ordered the Administrative

Law Judge to do the following:

- Consider whether reopening of the November 13, 2015
  determination is applicable per 20 CFR 404.988.

- Further evaluate the claimant's mental impairments in
  accordance with the special technique described in 20 CFR
  404.1520a, documenting application of the technique in the
  decision by providing specific findings and appropriate
  rationale for each of the functional areas described in 20
  CFR 404.1520a(c).

- Give further consideration to the claimant's maximum
  residual functional capacity and provide appropriate
  rationale with specific references to evidence of record in
  support of the assessed limitations (20 CFR 404.1545;
  Social Security Ruling 85-16, 96-8p).

- If warranted by the expanded record, obtain supplemental
  evidence from a vocational expert to clarify the effect of the
  assessed limitations on the claimant's occupational base
  (Social Security Ruling 85-15).  The hypothetical questions
  should reflect the specific capacity/limitations established by
  the record as a whole.  The Administrative Law Judge will
  ask the vocational expert to identify examples of appropriate
  jobs and to state the incidence of such jobs in the national
  economy (20 CFR 404.1566).  Further, before relying on the
  vocational expert evidence the Administrative Law Judge

> will identify and resolve any conflicts between the
> occupational evidence provided by the vocational expert and
> information in the *Dictionary of Occupational Titles* and its
> companion publication, the *Selected Characteristics of*
> *Occupations* (Social Security Ruling 00-4p).

*Id*. at 225.  Before the Appeals Council, Evans also raised a challenge under the

Appointments Clause of the United States Constitution to the manner in which the

Administrative Law Judge was appointed. *Id*.  Observing that remand to a different

Administrative Law Judge cures any such defect, the Appeals Council remanded

the case to a different Administrative Law Judge. *Id*. at 225–26.  And the Appeals

Counsel directed that the new Administrative Law Judge "offer the claimant an

opportunity for a hearing, take any further action needed to complete the

administrative record, and issue a new decision." *Id*. at 226.

After remand, on February 26, 2020, Evans appeared with counsel at a

hearing before Administrative Law Judge Paula Garrety (hereafter "the ALJ"). *Id*.

at 44–79.  At that hearing, Evans amended her alleged onset date to January 15,

2016. *Id*. at 48.  Evans testified at the hearing as did a vocational expert. *Id*. at 51–

79.  The ALJ subsequently determined that Evans had not been disabled from

January 15, 2016 (the amended alleged onset date), through December 31, 2016

(the date last insured). *Id*. at 35–36.  And so, she denied Evans benefits. *Id*.  Evans

appealed the ALJ's decision to the Appeals Council, which denied her request for

review on January 28, 2021. *Id*. at 1–7.  This makes the ALJ's decision the final

decision of the Commissioner subject to judicial review by this Court.

In March 2021, Evans, through counsel, began this action by filing a

complaint claiming that the Commissioner's decision is not supported by

substantial evidence and contains errors of law. *Doc. 1* ¶¶ 18, 19.  She requests that

the court reverse the Commissioner's decision and award her benefits, or in the

alternative, remand the case to the Commissioner for further proceedings. *Id*. at 3

(Wherefore Clause).

The parties consented to proceed before a magistrate judge pursuant to 28

U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 12*.  The

Commissioner then filed an answer and a certified transcript of the administrative

proceedings. *Docs. 13, 14*.  The parties filed briefs, *see docs.* 17, 20, 21, and this

matter is ripe for decision.

## III.  Legal Standards.

### A. Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's

application for benefits, "the court has plenary review of all legal issues decided by

the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).

But the court's review of the Commissioner's factual findings is limited to whether

substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019).  "[T]he threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct. at 1154.  Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether Evans was disabled, but whether substantial evidence supports the Commissioner's finding that she was not disabled and whether the Commissioner correctly applied the relevant law.

### B. Initial Burdens of Proof, Persuasion, and Articulation.

To receive benefits under Title II of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).  Further, to receive disability insurance benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).[4]

---

[4] "Disability insurance benefits are paid to an individual if that individual is disabled and 'insured,' that is, the individual has worked long enough and paid social security taxes." *Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 1028439, at *1

The ALJ follows a five-step sequential-evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a).  Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4)(i)–(v).

The ALJ must also assess a claimant's RFC at step four. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 198 n.2 (3d Cir. 2019).  The RFC is "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. § 404.1545(a)(1).  In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe

---

n.5 (M.D. Pa. Mar. 14, 2014) (citing 42 U.S.C. §§ 415(a), 416(i)(1)).  "The last date that an individual meets the requirements of being insured is commonly referred to as the 'date last insured.'" *Id*. (citing 42 U.S.C. § 416(i)(2)).  Here, the ALJ determined that Evans met the insured-status requirements through December 31, 2016. *Admin. Tr.* at 24.

impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R.
§ 404.1545(a)(2).

"The claimant bears the burden of proof at steps one through four" of the
sequential-evaluation process. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d
Cir. 2010).  But at step five, "the Commissioner bears the burden of establishing
the existence of jobs in the national economy that an individual with the claimant's
impairments is capable of performing." *Zirnsak v. Colvin*, 777 F.3d 607, 616 (3d
Cir. 2014).

The ALJ's disability determination must also meet certain basic substantive
requisites.  Most significantly, the ALJ must provide "a clear and satisfactory
explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642
F.2d 700, 704 (3d Cir. 1981).  "The ALJ must indicate in his decision which
evidence he has rejected and which he is relying on as the basis for his finding."
*Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999).  The
"ALJ may not reject pertinent or probative evidence without explanation." *Johnson
v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).  Otherwise, "'the
reviewing court cannot tell if significant probative evidence was not credited or
simply ignored.'" *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

**IV.  The ALJ's Decision.**

On March 9, 2020, the ALJ denied Evans's claim for benefits. *Admin. Tr.* at 19–43.  She proceeded through the five-step sequential-evaluation process.

At step one of the sequential-evaluation process, the ALJ found that Evans had not engaged in substantial gainful activity since the amended alleged onset date of January 15, 2016. *Id.* at 25.

At step two of the sequential-evaluation process, the ALJ found that Evans had the following severe impairments: mood disorder, anxiety, obsessive-compulsive disorder, and post-traumatic stress disorder. *Id*. at 25.  She also found that although Evans had a history of substance abuse, Evans had been on a Suboxone program since 2011, and, thus, her past substance abuse does not qualify as a severe impairment. *Id*. at 25.

At step three of the sequential-evaluation process, the ALJ found that Evans did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 25–27.  Specifically, that ALJ considered Listings 12.04, 12.06, and 12.15. *Id*.

The ALJ then determined that Evans had the RFC "to perform a full range of work at all exertional levels" but with some nonexertional limitations. *Id*. at 27.  She determined that Evans "could not have more than superficial contact with the public and coworkers[,]" and that Evans "could perform no more than simple,

11

routine and repetitive tasks." *Id*.  And she determined that Evans "could not

perform any assembly line production work." *Id*.  The ALJ also limited Evans "to

work in which she performs the same job duties on a day-to-day basis." *Id*.  In

making this RFC assessment, the ALJ reviewed Evans's assertions and testimony,

her treatment records, her daily activities, and the opinion evidence in the record.

*Id*. at 28–34.

At step four of the sequential-evaluation process, the ALJ found that Evans

was unable to perform her past relevant work as a cashier/stock clerk. *Id*. at 34.

At step five of the sequential-evaluation process, considering Evan's age,

education, work experience, and RFC, as well as the testimony of a vocational

expert, the ALJ found that there were jobs—such hand packager, laundry worker,

and sorter—that exist in significant numbers in the national economy that Evans

could perform. *Id*. at 35.

In sum, the ALJ concluded that Evans was not disabled from January 15,

2016 (the amended alleged onset date) through December 31, 2016 (the date last

insured. *Id*. at 35.  Thus, she denied Evans's claim for benefits. *Id*. at 36.

## V.  Discussion.

Evans raises the following claims: (1) the Commissioner's decision is

constitutionally defective and should be reversed because the Commissioner—

12

under whom the ALJ issued the final decision—served a longer term that the

president and was removable only for cause in violation of separation of powers;

(2) the ALJ erroneously assigned little weight to her treating physician; (3) the ALJ

erroneously rejected the assessments of the consultative psychologist; (4) the ALJ

failed to present to the vocational expert a hypothetical question that contained all

her credibly established limitations; and (5) the vocational expert's testimony did

not provide substantial evidence of jobs existing in significant numbers that she

could perform.[5]  We start with the last claim, and we conclude that remand is

required because that ALJ's conclusion that there are jobs existing in significant

numbers in the national economy that Evans could perform, which finding was

based on the testimony of the vocational expert, is not supported by substantial

evidence.  Because we conclude that remand is warranted based on this claim, we

do not reach Evans's other claims.[6]

---

[5] Evans combines the last two claims under one heading. *See doc 17* at 4.
Although both claims concern the testimony of the vocational expert, the two
claims are very different.  Thus, we break them out as separate claims.

[6] "Plaintiff's additional claims of error may be remedied through the case's
treatment on remand." *Brown v. Saul*, No. CV 3:18-1619, 2020 WL 6731732, at *7
(M.D. Pa. Oct. 23, 2020), *report and recommendation adopted*, 2020 WL
6729164, at *1 (M.D. Pa. Nov. 16, 2020).  "A remand may produce different
results on these claims, making discussion of them moot." *Id*.

Evans claims that that the vocational expert's testimony does not provide substantial evidence of jobs existing in significant numbers that she could perform. To set the stage for the discussion of this claim, we begin by setting forth the vocational expert's testimony and the ALJ's decision regarding job numbers. Then, after setting forth what the Commissioner's burden entails regarding job numbers, we conclude that here the ALJ's decision in that regard, which was based on the vocational expert's testimony, is not supported by substantial evidence. Finally, we conclude that remand to the Commissioner for further proceedings is appropriate.

### A.  The Vocational Expert's Testimony and the ALJ's Decision.

The vocational expert testified at the administrative hearing. *Admin. Tr.* at 68–77.  Based on a hypothetical question posed by the ALJ, the vocational expert testified that a hypothetical individual of the same age as Evans and with the same education, work history, and limitations that the ALJ outlined could not do Evans's past relevant work. *Id*. at 68–69.  One of the limitations that the ALJ included in his hypothetical was that the individual be limited to "work that is essentially performed without change or alteration on a day-to-day basis." *Id*. at 69.  The vocational expert testified that an individual with such a limitation would also not be able to do other work. *Id*.  But after the ALJ clarified that the limitation meant

only that the person would "basically perform the same job every day[,]" the

vocational expert testified that there were other jobs that the hypothetical

individual could perform:

> A       Okay, yes, the person is looking at the same types of job
> duties on a day-to-day basis then we're basically looking at
> unskilled work.  That would exist at various exertional levels
> within the economy.  Representative examples, one
> representative example would be a hand packager.  The SVP
> level would be a 2.  One moment, national numbers, 700,560,
> Pennsylvania would be 24,550.  A DOT would be 920.587-018.
> A second example would be a laundry worker.  In the DOT this
> is described, it's a medium job.  It's unskilled.  The SVP would
> be a 2.  National numbers would be 209,350.  Pennsylvania
> would be 7,460.  A DOT would be 361.685-018.  One moment,
> a third example, a sorter position.  In the DOT this is described
> as a light, unskilled job.  The SVP is a 2.  National numbers are
> 230,760.  I'm sorry, one second, Pennsylvania 3,520.  A DOT
> is 222.687-014.
>
> Q       And are these jobs [t]hat you've identified are they
> generally consistent with the definitions contained in the DOT?
>
> A       Yes, Judge.

*Id*. at 69–70.  Evans's attorney then questioned the vocational expert about the

limitation regarding changes or alterations in the work day-to-day, which, in turn,

lead to further questions from the ALJ and further testimony about that from the

vocational expert. *Id*. at 70–74.  Then, after asking the vocational expert

hypothetical questions with different limitations, *id*. at 74–75, Evans's attorney

questioned the vocational expert about the numbers for the three jobs she had

identified:

Q      Okay, I think this is my last question.  The numbers you gave us both nationally and statewide for the three job titles that you testified would be possible under the Judge's hypothetical as amended, hand packager –

A      I'm sorry, I didn't hear the last part of what you said.

Q      I'm referring now to the three jobs you testified to.  You gave us numbers, national and state numbers.

A      Yes.

Q      For three specific job titles, hand packager, laundry worker and sorter you gave us DOT numbers.

A      Yes.

Q      The numbers of jobs, both in the nation and in the state that you testified to are those numbers of those particular jobs or are they in fact numbers of the occupational group to which each of them belong?

A      Oh, I'm sorry, I didn't understand what you said at first. No, they should be the numbers for those particular jobs, yes.

Q      How are those derived?

A      I use two sources.  I use the Bureau of Labor Market Statistics as well as using SkillTRAN which provides information regarding the incidence of numbers per DOT.

Q      But it's my understanding that the statistics you're referring to are kept for an occupational group that would include, for example, with hand packagers, a number of other jobs that are in the same group and that that's how the jobs are assessed in terms of numbers in the national economy.  Is that not true?

A      Yes, that's correct.

Q      So then there are 700,560 jobs in the group that includes hand packager in the United States.  Is that correct?

A      Yes.

Q      But not specifically 700,560 hand packager positions, correct?

A      Right, well, yes, I know what you mean, yes, correct.

ATTY:  Okay, I don't have further questions for the vocational expert, Your Honor.

*Id.* at 75–77.  The ALJ did not ask the vocational expert any other questions. *Id.* at 77–79 (asking Evans (but not the vocational expert) some other questions before closing the hearing).

Despite the vocational expert's testimony that the numbers that she had given for the three jobs she had identified were not, in fact, numbers for only those jobs and despite the fact that the ALJ asked no further questions of the vocational expert about job numbers, the ALJ, in her decision, relied on the vocational expert's testimony regarding job numbers:

> Through the date last insured, the claimant's ability to perform work at all exertional levels was compromised by nonexertional limitations.  To determine the extent to which these limitations eroded the occupational base of unskilled work at all exertional levels, the Administrative Law Judge asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors the individual would have been able to perform the requirements of representative occupations such as a hand packager (DOT# 920.587-018 with 700,550 jobs in the national economy), a laundry worker (DOT# 361.685-018 with 209,350 jobs in the national economy) and a sorter (DOT# 222.687-014 with 230,750 jobs in the national economy).

> Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles (DOT). Further, the vocational expert indicated that there would be some changes in unskilled jobs, but they would be rare and not significant in her experience, as the day to day job duties would remain the same. As such, this additional testimony is not inconsistent with the DOT, although it is not specifically identified by the publication. As such the vocational expert testified the jobs noted above could be performed with the above limitations.

*Id*. at 35. The ALJ then concluded that Evans "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." *Id*.

### B.  Substantial evidence does not support the Commissioner's Step 5 finding regarding other work.

The Social Security Act provides that an individual is disabled only if she cannot do her previous work and if she cannot "engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C.A. § 423(d)(2)(A). And the Act further provides that "[f]or purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of

the country." *Id.* Accordingly, "[a]t the fifth step, the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003) (footnote omitted). That inquiry has two components: one focused on the kind of jobs available to the claimant, and the other focused on the number of such jobs. *Biestek*, 139 S. Ct. at 1152. "The ALJ need[s] to identify the types of jobs [the claimant] could perform notwithstanding his disabilities." *Id.* "And the ALJ need[s] to ascertain whether those kinds of jobs 'exist[] in significant numbers in the national economy.'" *Id.* (quoting 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1)).

Vocational expert testimony may provide substantial evidence to support an ALJ's findings at Step 5. *See Zirnsak*, 777 F.3d at 616 ("The Commissioner can also rely on testimony from a VE to meet its step-five evidentiary burden."). And it often does. But not always. *See e.g. Boone*, 353 F.3d at 211 (3d Cir. 2003) (concluding that the vocational expert's "testimony does not constitute substantial evidence that Boone can perform a significant number of jobs that exist in the economy, and the record does not otherwise contain that evidence"); *see also Biestek*, 139 S. Ct. at 1157 (rejecting categorical rule that would have provided that whenever a vocational expert refuses to disclose the data underlying her opinion,

that opinion does not meet the substantial-evidence standard, and instead observing that "[s]ometimes an expert's withholding of such data, when combined with other aspects of the record, will prevent her testimony from qualifying as substantial evidence[,]" . . . "[b]ut sometimes the reservation of data will have no such effect"); *Ruenger v. Kijakazi*, 23 F.4th 760, 762–64 (7th Cir. 2022) (concluding that the ALJ's conclusion that there were a significant number of jobs in the national economy for the claimant to perform was not supported by substantial evidence where the manner in which the vocational expert obtained her job numbers was unclear and where the vocational expert failed to justify the methodology that she used to obtain those numbers); *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1278–83 (11th Cir. 2020) (concluding that substantial evidence did not support the ALJ's finding that there were a significant number of jobs in the national economy that the claimant could perform where "[t]he vocational expert's testimony as to available jobs, on which the ALJ relied, was significantly and admittedly flawed"); *Chavez v. Berryhill*, 895 F.3d 962, 963 (7th Cir. 2018) (concluding that the ALJ's decision at Step 5 "was not supported by substantial evidence because the ALJ failed to ensure that the vocational expert's job estimates were reliable").

Whether vocational expert testimony provides substantial evidence for an ALJ's decision is a "case-by-case" inquiry. *Biestek*, 139 S. Ct. at 1157.  The

inquiry "takes into account all features of the vocational expert's testimony, as well as the rest of the administrative record." *Id.* "And in so doing, it defers to the presiding ALJ, who has seen the hearing up close." *Id.*

Vocational Experts "may use a wide range of data sources and methodologies to generate job-number estimates." *White v. Kijakazi*, 44 F.4th 828, 834 (9th Cir. 2022) (citing cases describing different sources and methods used by vocational experts); *see also Ruenger*, 23 F.4th at 761–62 (same). "The Social Security Administration's regulations authorize the agency to 'take administrative notice of reliable job information' from the DOT, among other publications." *Chavez*, 895 F.3d at 965 (citing 20 C.F.R. § 416.966(d)(1)); *see also* 20 C.F.R. § 404.1566 (d)(1). "As a result, in cases like these, the DOT is a source that VEs regularly canvass to identify job titles suitable for a claimant." *Id.*

"Aside from being three decades old, the DOT presents other difficulties." *Goode*, 966 F.3d at 1281. "DOT codes, for example, do not provide statistical information about the number of jobs available in the national economy." *Id.* "And while the Government collects job data, it does so at an aggregated group level, rather than by DOT occupation, which renders estimating the number of jobs available in the economy for a given DOT occupation no easy task." *Purdy v.*

*Berryhill*, 887 F.3d 7, 15 (1st Cir. 2018).  Thus, vocational experts "must look to other sources . . . to find employment statistics." *Goode*, 966 F.3d at 1281.[7]

Here, as set forth above, the vocational expert in this case testified that she relied on two sources for her job numbers—"the Bureau of Labor Market Statistics" and "SkillTRAN," which she initially testified "provides information regarding the incidence of numbers per DOT." *Admin. Tr.* at 76.  And after Evans's attorney asked the vocational expert if the numbers she had provided were for the particular jobs she identified or, instead, for the occupational groups to which those particular jobs belonged, she said "they should be for those particular jobs . . . ." *Id.*  But on further questioning by Evans's attorney about how those

---

[7] Some of the commonly used other sources, however, do "not compile data by DOT codes, but rather through the Standard Occupational Classification (SOC) system[,]" which "groups together detailed occupations with similar job duties." *Goode*, 966 F.3d at 1281.  "As a result, a single SOC group may contain multiple DOT occupations." *Id.*  And "[t]he use of one system to supply the job titles and another to provide the number of jobs creates a matching problem: a one-to-one correlation does not exist." *Chavez*, 895 F.3d at 965.  "When a VE identifies an SOC code and the number of jobs in that code, that number approximates (at best) the number of positions within a DOT job group—not the specific DOT job title that the VE identified as suitable for a particular claimant." *Id.* at 965–66.  To address this matching problem, "when asked to estimate jobs in the national economy, VEs normally use one of two methods: the equal distribution method or the occupational density method." *Engel v. Kijakazi*, No. 21-CV-1042-BHL, 2022 WL 10073443, at *3 (E.D. Wis. Oct. 17, 2022).  Here, the parties do not address which method (if either) the vocational expert used in this case, and we need not delve into that issue.

numbers were derived, the vocational expert conceded that the numbers she provided applied to occupational groups that included the specific jobs she had cited as well as other jobs in the same occupational group. *Id*. at 76–77. The ALJ did not further question the vocational expert to attempt to clarify her testimony or methodology. And ignoring the vocational expert's concession that the numbers she gave were for occupational groups, not specific jobs, the ALJ cited the numbers given by the vocational expert as numbers for the specific jobs identified by the vocational expert. *Id*. at 35. Although the substantial-evidence standard is a low bar, as to the number of jobs that exist in the national economy that Evans can perform, even that low bar has not been met here.

The Commissioner contends that the vocational expert was not required "to provide the exact number of jobs available for each job." *Doc. 20* at 34–35 (citing 20 C.F.R. § 404.1566(b), which requires "a significant number of jobs"). We agree. "The VE is not required to perform a literal headcount of jobs in existence; she must only advance a reasonable approximation." *Peterson v. Kijakazi*, No. 20-CV-1139-BHL, 2022 WL 14787607, at *3 (E.D. Wis. Oct. 26, 2022). But the problem with the vocational expert's testimony in this case is not that she failed to pinpoint an exact number of jobs. She provided exact numbers. But then she retreated from that testimony, admitting that the numbers that she provided were for broader categories of jobs, not the jobs that she had specifically identified.

23

Thus, "the issue in this case is not that the expert failed to provide specific

numbers, but that her testimony contained inconsistencies and lacked the clarity

needed for the ALJ to have confidence in her estimates." *Ruenger*, 23 F.4th at 763–

64; *see also Goode*, 966 F.3d at 1284–85 (concluding that "when an ALJ at step

five relies on the testimony of a vocational expert for the number of jobs in the

national and regional economies that a claimant could perform, that testimony

cannot be both internally inconsistent and incomplete").

Although the Commissioner admits that "there is no specific sources that

will identify the actual number of jobs for a specific job title," she suggests that

here the vocational expert "testified that there is work available under the broader

categories, the job numbers are significant, and this indicates that there exists in the

national economy jobs that Plaintiff can perform with the ALJ's RFC

determination." *Doc. 20* at 35.[8]  But given that the vocational expert retreated from

_____

[8] The Commissioner cites *Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987),
suggesting that in that case the Third Circuit concluded that "substantial evidence
supported [the] ALJ's RFC where [the] VE indicated there were about 200 jobs
available in the national economy that the plaintiff could perform." *Doc. 20* at 35.
In fact, in *Craigie*, the Third Circuit stated that the vocational expert "indicated
there were about 200 jobs in the light exertional category within [the claimant's]
capabilities in his region" (not in the national economy) and that "[t]his is a clear
indication that there exists in the national economy other substantial gainful work
which Craigie can perform." 835 F.2d at 58.  In any event, unlike in *Craigie*,
where the vocational expert's testimony provided a number, here given the
vocational expert's concession, we do not have a number to work with for the
particular jobs that the vocational expert identified.

the numbers she initially gave, we have no idea from the vocational expert's testimony even an approximate number of jobs for the three jobs she identified. And the fact that she initially provided job numbers that were significant means nothing. *See Engel*, 2022 WL 10073443, at *3 (rejecting the Commissioner's argument that even if the vocational expert's "method produced an abnormally large margin of error, she identified jobs so plentiful (about 584,000) that even the dregs qualify as significant" and observing that "big numbers mean nothing without a sound methodology behind them"); *Brace v. Saul*, 970 F.3d 818, 823 (7th Cir. 2020) (rejecting a similar argument and observing that "[a]n unreliable job-number estimate cannot be considered reliable merely because it is large"). Further, the ALJ did not acknowledge that the vocational expert changed her testimony.  Nor did the ALJ explain how the vocational expert's testimony supports that the finding that "other work" for Evans "existed in significant numbers in the national economy." *Admin. Tr.* at 35.  Instead, the ALJ relied on the number of jobs in the national economy identified by the vocational expert before

---

Asserting that the jobs listed by the vocational expert were "only representative examples—not an exhaustive list—of jobs that [Evans] was capable of performing[,]" the Commissioner contends that she "has met her burden of identifying at least one job in the national economy [Evans] can perform." *Id*. at 33–35.  But at issue here is not whether Evans can perform the identified jobs. Rather, the question is whether any of those jobs exist in significant numbers in the national economy.

she admitted that those numbers were not really for the jobs she identified, but, rather, for broader occupation categories.  Given that the ALJ did not acknowledge, much less address and resolve, the contradiction in the vocational expert's testimony, we cannot say that the ALJ's finding as to significant number of jobs in the national economy is supported by substantial evidence.

### C.  Remand is the appropriate remedy.

Because the ALJ's decision is not support by substantial evidence, the question then is whether the court should remand the case to the Commissioner for further proceedings or award benefits to Evans, as she requests in her complaint. *See doc. 1* at 3 (Wherefore Clause) (requesting that the court reverse and set aside the Commissioner's decision or, in the alternative, remand the case to the Commissioner for further proceedings).  We conclude that remand is the appropriate remedy.

Under sentence four of 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  Thus, although a remand is often the appropriate remedy, the court may also enter an order awarding the claimant benefits. *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 358 (3d Cir. 2008)

(remanding the case to the district court with directions to enter an order awarding the payment of benefits); *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000) (same); *Podedworny v. Harris*, 745 F.2d 210, 223 (3d Cir. 1984) (same).  But an "award [of] benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221–22.  Whether there has been excessive delay and/or prior remands also bears on whether to award benefits or to remand for further proceedings. *Diaz v. Berryhill*, 388 F. Supp. 3d 382, 391 (M.D. Pa. 2019).  "Thus, in practice any decision to award benefits in lieu of ordering a remand for further agency consideration entails the weighing of two factors: First, whether there has been an excessive delay in the litigation of the claim which is not attributable to the claimant; and second, whether the administrative record of the case has been fully developed and substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Id*.

Here, there has not been excessive delay in the litigation of Evans's claim, and we cannot say that substantial evidence on the record as a whole shows that Evans was disabled during the relevant time period and entitled to benefits.  Thus, we will remand the case to the Commissioner for further proceedings.

27

**VI. Conclusion.**

For the foregoing reasons, we will vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  An appropriate order follows.


<u>**S/Susan E. Schwab**</u>
Susan E. Schwab
United States Magistrate Judge